PD-0172-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/25/2015 1:30:13 PM
Accepted 3/25/2015 3:04:24 PM
ABEL ACOSTA
CLERK

No. PD-0172-15

# TO THE COURT OF CRIMINAL APPEALS OF TEXAS

NORMA JEAN CLARK
*Appellant*

v.

THE STATE OF TEXAS,
*Appellee*

---

## PETITION FOR DISCRETIONARY REVIEW

---

On Petition For Discretionary Review from the First Court of Appeals Cause No. 01-13-00373-CR, affirming the judgment in Cause No. 1295757 from the 228th District Court of Harris County, Texas.

---

FILED IN
COURT OF CRIMINAL APPEALS

March 25, 2015

ABEL ACOSTA, CLERK

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas

**SARAH V. WOOD**
Assistant Public Defender
Harris County, Texas
Texas Bar Number 24048898
1201 Franklin, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278
Sarah.Wood@pdo.hctx.net

**Counsel for Appellant**

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:

Norma Jean Clark

TRIAL PROSECUTORS:

Donna Logan
Katherine McDaniel
Assistant District Attorneys
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002

DEFENSE COUNSEL AT TRIAL:

E. Dee McWilliams
Neal Davis, III
440 Louisiana, Suite 200
Houston, Texas 77002

PRESIDING JUDGE:

Hon. Marc Carter
228th District Court
Harris County, Texas
1201 Franklin, 16th floor
Houston, Texas 77002

DEFENSE COUNSEL ON APPEAL:

Sarah V. Wood
Assistant Public Defender
Harris County, Texas
1201 Franklin, 13th Floor
Houston, Texas 77002

# TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................................ ii

Table of Contents ..................................................................................................... iii

Index of Authorities ................................................................................................. iv

Statement Regarding Oral Argument ........................................................................ v

Statement of the Case ............................................................................................... v

Statement of Procedural History ............................................................................. v

Grounds For Review .................................................................................................. v

Argument ................................................................................................................... 1

Reasons for Review ................................................................................................. 1

Factual Background .................................................................................................. 2

Ground Number One ............................................................................................... 8

In reviewing deficient performance, is a court limited to considering only the strategy that counsel articulated when he testified at a motion for new trial hearing—or can his actions be justified based on any plausible strategy that the court can conceive?

a. Overview ............................................................................................................ 8

b. The Court's *In*Applicable Law ......................................................................... 9

c. The Court's Background ................................................................................... 10

d. The Court's Analysis ........................................................................................ 11

Ground Number Two .............................................................................................. 15

The court of appeals erred in holding the evidence sufficient where the finding of guilt was necessarily based on speculation.

Prayer for Relief ...................................................................................................... 18

Certificate of Service and Compliance .................................................................... 18

Appendix .................................................................................................................. 19

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. State*, 193 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ..... 14

*Clark v. State*, 01-13-00373-CR, 2015 WL 162257 (Tex. App.—Houston [1st Dist.] Jan. 13, 2015, no. pet. h.). ............................................................................................passim

*Garcia v. State*, 57 S.W.3d 436 (Tex. Crim. App. 2001). ...................................................... 14

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007) .......................................................... 15

*Rabb v. State*, 434 S.W.3d 613 (Tex. Crim. App. 2014) .......................................................... 17

*Richard Winfrey v. State,* 323 S.W.3d 875 (Tex. Crim. App. 2010). ...................................... 16

*Rylander v. State*, 101 S.W.3d 107 (Tex. Crim. App. 2003). .................................................. 13

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) ...................................................... 14

*Winfrey v. State*, 393 S.W.3d 763 (Tex. Crim. App. 2013). .................................................... 16

### STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument as it may aid the Court since the analysis of this case depends upon a detailed review of the record in an interesting case.

### STATEMENT OF THE CASE

Pursuant to a "cold case" investigation, Ms. Clark was indicted on May 16, 2011 for the murder of her late husband, alleged to have occurred twenty-four years earlier in 1987 (C.R. at 17 ). She pleaded not guilty and, after a jury trial lasting for over two weeks, was convicted and ultimately sentenced to twenty-five years in prison (C.R. at 228). Counsel on appeal filed a motion for new trial and at a hearing admitted items of evidence that the jury had not seen (C.R. at 217).

### STATEMENT OF PROCEDURAL HISTORY

The First Court of Appeals affirmed the trial court's judgment in an unpublished opinion. *Clark v. State*, 01-13-00373-CR, 2015 WL 162257 (Tex. App.—Houston [1st Dist.] Jan. 13, 2015, no. pet. h.). No motion for rehearing was filed.

### GROUNDS FOR REVIEW

1. In reviewing deficient performance, is a court limited to considering only the strategy that counsel articulated when he testified at a motion for new trial hearing—or can his actions be justified based on any plausible strategy that the court can conceive?

2. The court of appeals erred in holding the evidence sufficient where the finding of guilt was necessarily based on speculation.

# ARGUMENT

## Reasons for Review

1.  The court below held that counsel's failure to introduce a powerfully exculpatory death threat against the victim made days before his murder *could have been* based on a reasonable strategy even though it was never articulated by counsel at the motion for new trial hearing. Caselaw already establishes that if counsel has not had an opportunity to articulate his strategy, a reviewing court *may* speculate on any plausible strategy in order to justify his actions. However, counsel cannot find authority explicitly stating the converse—that a reviewing court may *not* speculate where counsel has already articulated his strategy. Specifically, is a reviewing court limited to considering counsel's stated strategy even though others may exist?

    In this way, the First Court of Appeals has decided an important question of law in a way that conflicts—by implication—with other decisions and it has decided an important question of law that has not been, but should be, settled by the Court of Criminal Appeals.

2.  By finding the evidence sufficient, the court of appeals has so far departed from the accepted course of proceedings as to call for this Court's supervisory power.

**Factual Background**

On April 22, 1987, Ed Clark was murdered, shot while asleep in bed. At the time, police had suspicions about his wife, Norma Clark, who was the only person home at the time of the shooting, sleeping in an upstairs bedroom. A grand jury investigation occurred, but no charges were brought (6 R.R. at 15). Ms. Clark lived a quiet life for the next quarter of a century (10 R.R. at 17).



Mr. and Mrs. Clark

Then in 2010, the investigation reopened when a forensic examiner observed a pattern of microscopic spots on Mrs. Clark's nightgown that resembled blood spatter. As the court of appeals noted, further testing revealed that only one microscopic spot on the nightgown tested positive for blood and its source could not be identified. *Clark v. State*, 01-13-00373-CR, 2015 WL 162257, at 4 (Tex. App.—Houston [1st Dist.] Jan. 13, 2015, no. pet. h.).

Nevertheless, the stains were characterized at trial by the prosecution as "blood

spatter" due to the "mist" pattern. However, it was also revealed that the method for testing for gunshot residue in 1987 required the nightgown to have been "misted" with chemicals. (5 R.R. at 67). The unidentified microscopic staining on the nightgown was the only new information used to pursue charges against the sixty-seven-year old woman with no criminal history.

A two-week long trial revealed largely undisputed evidence that could paint a picture of either guilt or innocence depending upon who held the brush. No "smoking gun" ever developed. Memories were so ravaged by the passage of twenty-five years that inconsistencies were far too many to list. The court of appeals' opinion lays out the most convincing possible argument for guilt. But for each fact the court found incriminating, there generally existed another undisputed fact suggesting innocent circumstances.

For instance, the court of appeals noted that at the time of the shooting, "the alarm, which Clark routinely set, did not go off." *Clark*, at 7. However, the court fails to mention that State's witnesses testified that Mr. Clark always complained that "Norma never sets the alarm, or she would turn it off and never set it." (6 R.R. at 74, 113). Also, it was undisputed that Mr. Clark had been assaulted in the home a few months prior by an unknown male intruder (not Norma) who also somehow entered the house without breaking-in. (5 R.R. at 196).

The court of appeals recited that upon fleeing to the neighbor's house after the shooting, "appellant spent 30 to 45 minutes in the bathroom." However, Norma was

3

in the bathroom vomiting due to shock and illness. (6 R.R. at 78).

The court also observed, "Appellant claimed to have run through the woods after she heard shots, but when she appeared at the [neighbors'] house, her gown and feet were both clean." This fact was trumpeted a major point of guilt at trial. However, the significance was never clear. Obviously, she could have cleaned up during her time in the bathroom. Or a trail could have existed through the woods which would have kept her from becoming noticeably dirty. Police in 1987 never even walked into those woods to investigate (3 R.R. at 215-16). A video was made by previous defense counsel back in 1987 showing a relatively clear path. It was never introduced at trial, but was admitted at the motion for new trial hearing. (MNT at Court's Exhibit #10).

The court noted that after fleeing to the neighbor's house, "appellant signed a consent-to-search form, but was otherwise uncooperative." However, not only did she sign a consent form, she also described what occurred, answered the officer's questions, and agreed to come to the station later. The officer later admitted that his use of the word "uncooperative" was just "speculation." (3 R.R. at 222-23).

The court remarked that "appellant went to the bank the same day as the murder to withdraw funds." In a vacuum, this fact may appear incriminating. However, the same State's witness who testified about driving her to the bank stated that she went at his own insistence. He told Norma that she needed to get to the bank quickly "because usually when people die, or get killed, the banks lock up all your

4

stuff." (9 R.R. at 228).

The court stated Norma told her friend "that she was afraid the police would blame her for the murder…'" However, this same friend testified that she urged Norma to call an attorney, telling her, "You always want to talk to an attorney when something like this happens… Because a spouse is the first one they think did it." (6 R.R. at 137).

The court observed that Norma told people that "she could not take a GSR test because she had been firing a gun at home, even though she was supposed to have been home from work because she was sick." However, State's witnesses also testified that Mr. Clark had recently insisted that Norma learn to shoot a gun due to threats against his life and fears for their safety. (8 R.R. at 238-39). And it is unclear how being home sick from work would necessarily be inconsistent with having target practice in the backyard.

Moreover, as the court of appeals remarked, Norma went to the hospital and therefore did not meet officers at the station later that day as agreed. However, hospital records and the testimony of other State's witnesses confirmed that she was quite ill. (State's Exhibit 73; 6 R.R. at 76-77).

Furthermore, the court noted that the GSR tests performed in 2010 found two particles of GSR on the nightgown, stating that the "examiner described this as an inconclusive result because 1 in 10,000 people would have gunshot residue on them if they had not fired a weapon." This is actually a misstatement by the court because the

5

testimony was that 1 in 10,000 people would have 2 particles of GSR discovered by one test. In this case, they performed two separate tests and found one particle each time. Additionally, GSR is "highly transferrable," the Clarks lived in a high GSR environment because they had lots of guns, and the nightgown was handled by numerous police officers and kept in police evidence over the decades. (6 R.R. at 217). Also, the clothing was submitted twice for GSR testing in 1987 and the test results were negative (5 R.R. at 114). And of course, if she were home sick having target practice, she may have done so in her nightgown.

While the court of appeals stated that Mr. Clark was shot with his own gun, it was not clear at trial. Witnesses believed Mr. Clark owned a gun similar to the .38 left at the scene, but police did not find any other ammunition for a .38 inside the house (3 R.R. at 128; 5 R.R. at 199; 8 R.R. at 77). It was not until 2010 that police found it was registered to a man named Michael Todaro who had been in jail in Houston not long after the murder and was never investigated (5 R.R. at 176, 221-22; 8 R.R. at 77).



Michael Todaro

It was undisputed that Mr. Clark actually had a whole series of mysterious death threats (not from his wife) prior to his murder. In 1983 his home was severely vandalized. Witnesses confirmed that the interior of the home was "destroyed" and a note made from magazine letters said "what goes around comes around m__f__" (5 R.R. at 246; 7 R.R. at 56; 8 R.R. at 63). The damage was so meticulous that holes were drilled into the refrigerator.

 

A few months before his murder, Mr. Clark was the victim of an unusual assault where someone made an unforced entry into the house and beat him over the head while he was asleep on the couch (5 R.R. at 196). Norma called the police (3 R.R. at 241).

Then just days before Mr. Clark was murdered, an unknown male called and left an extremely frightening message on his answering machine, stating in a slow, serious voice, "I'm going to kill you. I know where you live. Tonight." (MNT at Court's Exhibit 13). The jury never got to hear this recording due to trial counsel's errors, discussed below.

The court of appeals mentioned that a State's witness informed the jury about the message. However, she told the jury that it did not sound threatening and that she heard laughter (6 R.R. at 61). This testimony was untrue and gave the jury a completely false impression. If the court of appeals had listened to the recording, they would have concluded that the threat was deathly serious. (MNT at Court's Exhibit 13). Police never investigated these incidents in relation to the murder.

Other circumstantial evidence described by the court of appeals can be clarified with additional undisputed facts from trial or easily chalked up to faulty, twenty-five-year-old memories.

**Ground Number One**

> On a claim of ineffective assistance, may a reviewing court speculate that trial counsel's actions could have been based on any plausible strategy that the court can imagine—even where counsel testified to an unreasonable strategy at a motion for new trial hearing.?

### a. Overview

Just days before Mr. Clark was murdered, a death threat was left on his answering machine. In the most serious, creepy tone you can imagine, a male voice uttered the words, "I'm going to kill you. I know where you live. Tonight." (MNT at Court's Exhibit 13). Remarkably, former counsel Rick Brass collected this tape in 1987 and then carefully preserved it for twenty-five years. The tape appears to be an exculpatory windfall. However, trial counsel never introduced the recording at trial.

At the motion for new trial hearing, trial counsel explained that he decided not

introduce the tape because Rick Brass's testimony to authenticate it would "vitiate the attorney/client privilege." (MNT at 39). The court of appeals agreed with appellant that Brass's testimony could not vitiate the privilege. Logically therefore, counsel's stated concern did not constitute a valid strategy.

However, the court of appeals disregarded trial counsel's "vitiation" explanation and instead speculated that he must have actually possessed another unstated strategy regarding "related communications." As a matter of law, Brass's testimony would have waived privilege within the narrow scope of "communications related to the recovery of the audiotape." Therefore, the court speculated, counsel could have actually feared revealing those "related communications"—even though counsel never actually mentioned it.

If counsel testifies to a one strategy, but another plausible strategy may exist, may a reviewing court rely upon it to justify counsel's actions?

### b. The Court's *In*Applicable Law

The court of appeals' opinion is largely written as if they were not aware that a hearing on the motion for new trial had occurred. The section entitled "Ineffective Assistance of Counsel" begins on page eight with a recitation of "Applicable Law" that is actually *not* applicable.

> We cannot speculate beyond the record provided, so any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *see Anderson v. State*, 193 S.W.3d 34, 39 (Tex. App.–Houston [1st Dist.] 2006, pet. ref'd). Because the record is usually

9

underdeveloped, direct appeal is often an inappropriate forum in which to bring this type of claim. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex.Crim.App.2003). The necessary record is best developed in a hearing on a motion for new trial or by application for a writ of habeas corpus. *See Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998).

These cases upon which the court purportedly based its reasoning are scarcely relevant in this case because an extensive hearing on a motion for new trial did occur. The record was developed. Inexplicably, the court's "Applicable Law" section then concludes:

> "Failure to object to admissible evidence does not constitute ineffective assistance of counsel." *Lee v. State*, 29 S.W.3d 570, 579–80 (Tex. App.–Dallas 2000, no pet.); see also *Ex parte Jimenez*, 364 S.W.3d 866, 887 (Tex. Crim. App. 2012) ("The failure to object to proper questions and admissible testimony ... is not ineffective assistance.").

The law regarding a failure to object is likewise inapplicable to this case because it was not an issue. By admittedly basing its analysis on irrelevant law, the court's holding is called into doubt.

### c. The Court's Background

In its section entitled "Background," the court unreasonably downplayed the importance of the tape, stating, "It is undisputed that the existence of the audiotaped threat was known to the jury through the testimony of other witnesses…"

While it was true that the jury knew a tape existed, they were completely misinformed about its nature. The State's witness testified, "It sounded like someone young, like a teenager. And I could hear laughing" and it "just didn't sound threatening to me." (6 R.R. at 62-63). This is completely false. If the court of appeals

10

had listened to the tape, they would have known it sounded serious and frightening—with no hint of laughter. A listener's visceral reaction to the tape should not be understated.

### d. The Court's Analysis

The court of appeals agreed with appellant that "Brass's testimony as to chain of custody would not be a blanket waiver of attorney-client privilege…" *Clark*, at 11. Trial counsel's stated concern that privilege would be "vitiated" was therefore legally unfounded.

However, the court concluded that the decision not to introduce the tape was actually because counsel did not want to risk opening the door to those communications related to the recovery of the tape.

> Even though we agree that Brass's testimony as to chain of custody would not be a blanket waiver of attorney-client privilege, and would only be a waiver as to communications related to the recovery of the audiotape or the creation of the videotape, we do not know what those related communications might have included had Brass been subject to cross-examination. As such, trial counsel had a strategic purpose in not calling Brass, as he testified in the motion for new trial hearing. Trial counsel's decision not to call Brass and risk opening up testimony to those related communications was a question of strategy, and his decision not to call appellant's former attorney in these circumstances does not fall below reasonably effective assistance.

*Clark*, at 11. Although the court did at least acknowledge that a motion for new trial

hearing occurred, it is incorrect to imply that counsel raised any concern about "related communications." In explaining his reasoning at the motion for new trial, counsel stated:

- "In my mind, the important aspect of it was—we were arguing about whether or not what effective [sic] Mr. Brass' testimony would be, would that—would that vitiate the attorney/client privilege." (MNT at 39).

- "I think that Mr. Brass' testimony regarding that would have vitiated attorney/client privilege." (MNT at 46).

- "State took the position that if I called Mr. Brass to the stand to lay that predicate in order to introduce that tape that that would vitiate the attorney/client privilege that existed between Mr. Brass and Ms. Clark." (MNT at 37).

- "[Ms. Clark] did not want to give up that attorney/client relationship." (MNT at 38).

- "And it was my opinion that should we use Mr. Brass to authenticate that, that would have vitiated the attorney/client privilege." (MNT at 40-41).

Trial counsel did not mention any concern about revealing communications related to the recovery of the tape—only fear that a full waiver would result.

The court of appeals complained that "we do not know what those related communications might have included had Brass been subject to cross-examination." *Clark*, at 11. But Brass *was* subject to cross-examination and he *did* testify about "related communications."

12

First, appellate counsel asked him questions to authenticate the tape. Brass testified:

> Norma had told me about its existence. At some point in time, I believe it was the same day I was there, but it could have been a different day, I'm not really sure. She told me that there was a message that threatened Ed's life and was left on their answering machine. And so at some point in time I had her take me to the answering machine. I listened to the message, and I retrieved the cassette tape from the machine and kept it in my possessions.

(MNT at 19). The same prosecutors who litigated the trial also litigated the hearing on the motion for new trial, and they cross-examined Rick Brass at that hearing after he authenticated the tape. They were even allowed to question Brass freely, as privilege was in fact vitiated at the hearing on the motion for new trial. (MNT at 26). Brass was questioned about why Norma didn't testify at the grand jury and other privileged matters. None of Brass's answers turned out to be damaging. The court's concern that "we do not know what those related communications might have included had Brass been subject to cross-examination" is unfounded since he was cross-examined.

In the cases cited by the court of appeals, trial counsel was never "afforded an opportunity to explain his actions." *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). Those cases held that "in the absence of a record reference concerning counsel's reasoning, we must generally presume that appellant's trial counsel had a plausible reason for his actions." *Anderson v. State*, 193 S.W.3d 34, 39 (Tex. App.—

13

Houston [1st Dist.] 2006, pet. ref'd) (citing *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999)).

Following this reasoning, the court held in this case that trial counsel "could have" had a "plausible reason" for failing to introduce the death threat. The court concluded, "[N]ot calling Brass to testify about the collection of the audiotape or the making of the videotape[1] **could have been** sound trial strategy because doing so would have subjected him to cross-examination on any related communications relayed to him by appellant. *Clark*, at 11 (emphasis added).

"[I]n the absence of evidence of counsel's reasons for the challenged conduct, an appellate court commonly will assume a strategic motivation if any can possibly be imagined…" *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Appellant contends that such imagination is inapplicable where counsel has been afforded an opportunity to explain his actions and the court is therefore limited to considering his stated explanation.

---

[1] The court of appeals also erred by applying the same incorrect analysis to counsel's failure to introduce the video walk-through of the woods, but for simplicity's sake only the audiotape is addressed here at length.

**Ground Number Two**

> The court of appeals erred in holding the evidence sufficient where the finding of guilt was necessarily based on speculation.

"The fact finder is…prohibited from drawing conclusions based on speculation or mere theorizing about the possible meaning of the facts." *Rabb v. State*, 434 S.W.3d 613, 617 (Tex. Crim. App. 2014). Each incriminating fact in this case is necessarily based on speculation. The weakness of the evidence is actually highlighted by the court of appeals' opinion which is strained to be written in the light most favorable to conviction.

In *Hooper v. State*, this Court explained the difference between inferences and speculation:

> A woman is seen standing in an office holding a smoking gun. There is a body with a gunshot wound on the floor near her. Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking). Is it also reasonable to infer that she shot the person on the floor? To make that determination, other factors must be taken into consideration. If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter.

*Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). In this case, Norma had no smoking gun, but others like Michael Todaro and those involved in the assault and death threats went uninvestigated.

As this Court has noted, "It is the obligation and responsibility of appellate

15

courts to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Furthermore, "if the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient to convict." *Richard Winfrey v. State,* 323 S.W.3d 875, 882 (Tex. Crim. App. 2010). In this case, the inconclusive forensic evidence and the conjecture about Ms. Clark's behavior do not rise above mere speculation.

In *Megan Winfrey v. State*, this Court was asked to decide whether the evidence of murder was sufficient when the record consisted of weak circumstantial evidence in combination with scientific evidence consisting of a dog-scent lineup. *Megan Winfrey v. State*, 393 S.W.3d 763 (Tex. Crim. App. 2013). The situation in *Megan Winfrey* is analogous to this case because the State rested on inconclusive scientific evidence in conjunction with weak circumstantial evidence to convict Ms. Clark. The Court in *Megan Winfrey* reasoned that unless the dog-scent lineup could be considered "primary" evidence of guilt, then it would not be sufficient to corroborate the additional circumstantial evidence beyond a reasonable doubt. *Id.* at 767. Due to the inherent limitations of dog-scent lineups, the Court held that it was of too little value to be considered primary evidence of guilt and acquitted the defendant because the additional evidence was only speculative. Likewise, in this case the evidence that the State wished to characterize as "blood spatter" is too weak to be considered primary evidence of guilt because it was—in fact—not blood spatter.

16

Similarly, in *Rabb v. State*, this Court held that where the evidence showed a plastic bag was swallowed, "a determination on whether it was intact or destroyed after passing through Appellant's stomach would be based purely on speculation." *Rabb v. State*, 434 S.W.3d 613, 617 (Tex. Crim. App. 2014).

In this case, a determination about whether unidentified stains on the nightgown were Mr. Clark's blood would be pure speculation. A determination about whether the two particles of GSR came from the gun that shot Mr. Clark or from decades in a police evidence room or from her home's "high GSR environment" would be sheer speculation. A determination on why Norma's feet were not dirty would be pure speculation. A determination on why she went to the hospital would be sheer speculation. A determination on why she spent half an hour in the bathroom would be speculation. Therefore, as in *Winfrey*, the speculative forensic evidence coupled with speculative circumstantial evidence is likewise insufficient to prove guilt beyond a reasonable doubt.

## PRAYER FOR RELIEF

For the reasons stated above, the Appellant prays that this Court grant her petition, review the case, and hold that the Court of Appeals erred by affirming the trial court's judgment of guilt.

Respectfully submitted,

**ALEXANDER BUNIN**
Chief Public Defender
Harris County Texas


**/s/ Sarah V. Wood**
**SARAH V. WOOD**
Assistant Public Defender
Harris County Texas
1201 Franklin, 13th Floor
Houston Texas 77002
(713) 368-0016 (phone)
(713) 368-9278 (fax)
State Bar Number 24048898


## CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that a copy of the foregoing petition for discretionary review has been served on the District Attorney of Harris County, Texas, by the efile service and to the State Prosecuting Attorney and that this petition has 4,193 words according to the computer program used to draft it.

**/s/ Sarah V. Wood**
**SARAH V. WOOD**

18

# APPENDIX

2015 WL 162257
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.
MEMORANDUM OPINION
DO NOT PUBLISH. TEX.R.APP. P. 47.2(B).
Court of Appeals of Texas,
Houston (1st Dist.

Norma Jean Clark, Appellant
v.
The State of Texas, Appellee
NO. 01–13–00373–CR | Opinion issued January 13, 2015

**On Appeal from the 228th District Court, Harris County, Texas, Trial Court Case No. 1295757**

**Attorneys and Law Firms**
Sarah V. Wood, for Norma Jean Clark.

Devon Anderson, Jessica A. Caird, Alan Curry, for The State of Texas.

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

**MEMORANDUM OPINION**

Sherry Radack, Chief Justice
**\*1** A jury found appellant, Norma Jean Clark, guilty of murder and assessed punishment at 25 years' confinement. In five points of error, appellant contends (1) the evidence is insufficient to support her conviction, (2) her trial counsel made an error amounting to ineffective assistance of counsel, (3) the trial court erred in admitting certain scientific testimony, (4) the trial court erred in admitting speculative testimony, and (5) the trial court erred in overruling defense counsel's objections to improper argument at closing. We affirm.

**BACKGROUND**
On April 22, 1987, Edmund Clark was murdered, shot while sleeping in his own bed. At the time, police suspected appellant, his wife, but no charges were ever brought against her. In 2008, during a review of cold cases in Harris County, a forensic examiner saw what he thought looked like microscopic blood spatter on appellant's nightgown, so the case was reopened. Appellant was extradited from Tennessee where she had been living, charged with Clark's murder, and ultimately convicted. The following is a summary of the evidence presented at trial.

*The immediate aftermath of the murder*
Around 4 a.m. on the morning of the murder, Judith Manack was awaked by a banging on the door that led from her

backyard to her bedroom. Judith's husband looked out and said, "My God, I think it's Norma." Appellant was the Manacks' neighbor and lived behind them through some dense woods. The Manacks let appellant in the house, and she kept saying, "Oh, my God, oh, my God. I heard shots. I heard shots." Judith's husband called the police.

Appellant was shaking and said she was going to throw up, so Judith showed her to the master bathroom, where she was sick. When she left the bathroom 30 to 45 minutes later, the Manacks called appellant's daughter, Tammy, and appellant then explained what had happened. She told them that she had been sleeping upstairs in a spare bedroom when she heard gunshots. Appellant said that she ran down the stairs, tried to get out the kitchen door, but it was locked, so she fled through the garage. Appellant told the Manacks that she had run through the woods to reach their house, but her nightgown and feet were clean.

When Tammy arrived at the Manacks' home, appellant hugged her, which Judith Manack found strange because appellant had been complaining that she had arm pain and could not use her arm just moments before. Appellant told Judith that she was afraid the police would blame her for the murder, to which Judith replied, "You don't have anything to worry about, you know, if you weren't shooting a gun." Judith was surprised when appellant told her that she had, in fact, been shooting a gun because Clark wanted her to learn how to shoot. Judith thought it was odd that appellant would have been out shooting a gun because she had missed work with bronchitis. While she was at the Manacks' with appellant, Tammy pulled out a piece of paper with three names—two doctors and one attorney. Appellant later called her doctor from Judith's house.

**\*2** The police responded to the call and went first to appellant's home. The front door was locked, but they found a door leading into the garage ajar, so they went in the house and began searching each room. In the master bedroom, they found Edmund Clark shot to death in his bed. He had been sleeping on his stomach with the blankets tucked in and pulled up around him, and had suffered a gunshot wound to the back and another to the head. No one had been sleeping next to him, but a bed upstairs had been slept in. No one else was in the house and no alarm had gone off, even though the house had an alarm system. There were no signs of robbery. Appellant later told Judith that she had gone out to feed the dog and had forgotten to set the alarm when she came back in.

A crime scene officer processed the crime scene and recovered a Charter Arms undercover .38 caliber revolver with three live rounds and two spent cartridges in it, which was sitting on the chest of drawers near Clark's body. At trial, Clark's son identified the revolver as his father's gun, which they had used for target practice. Police later determined that the gun was registered to a Michael Todaro. There were also 28 shotgun shells on the chest of drawers and a shotgun leaning next to it. A .25 caliber Beretta pistol was recovered from a nearby drawer in a nightstand. The officer also took possession of the sheets, comforter, and pillowcase from Clark's bed. By the time of trial, the comforter had been lost.

Detective A. Rossi was assigned to investigate the case, so he went to the Manacks' house to meet with appellant. Rossi testified that appellant was very reluctant to talk with him, though she did sign a consent-to-search form so that the police could search her home. Rossi noted that appellant was wearing a blue nightgown, and, even though she claimed to have traveled through the woods to the Manacks' home, the gown was clean. Appellant agreed to come to the police station to give a statement after she had changed clothes. However, appellant never showed up. When she left the Manacks' house, Judith thought appellant was going home to change and then going to the police station. Instead, appellant soon returned to Judith's house with her nightgown, which she asked Judith to wash because she was going to be too busy taking care of things and her washer was broken. Judith did not wash the garment, but instead folded it up and later turned it over to police.

The afternoon of the murder, Clark's friend, Paul Parris, came by and drove appellant to the bank "because usually when people die, or get killed, the banks lock up all your stuff."

Later that day, Rick Brass, appellant's attorney, called Detective Rossi and they discussed appellant coming in to give a statement. When they never showed up, Rossi learned that appellant had been admitted to the hospital, so he went there to speak with her the next day. Tammy, who was at the hospital with appellant, would not let Rossi in the room, but then came back out and said appellant wanted to talk to him, but not about the case. Rossi would have liked to have tested appellant's hands for gunshot residue [GSR], but he testified that "she wasn't very cooperative," and she had already showered. Rossi later obtained a grand jury subpoena in an effort to obtain appellant's statement, but appellant never appeared before the grand jury.

***The relationship between appellant and the deceased***

Several witnesses testified about the relationship between appellant and Clark. John Baff worked at the same company as Clark, and the two were friends. The night of the murder, Clark went to Baff s house, where the two discussed appellant's and Clark's relationship. Clark was unhappy with the relationship and the financial strain it was placing on him. He felt that appellant's antique business was placing a financial burden on the marriage. Clark also had issues with appellant's son, Mark, and had banned him from their house. While Clark was visiting Baff, he called and left appellant a voice mail. He told Baff that he intended to divorce appellant. Baff testified that "[Clark] kind of indicated to me that he was going home to lay it on the line, pursue what he had told me he was going to do."

**\*3** Judith Manack also testified about the relationship between appellant and Clark. Judith testified that appellant seemed to be jealous of the time that Clark spent with his children. She was also unhappy that Clark would not give her more money and told Judith that he verbally abused her. Judith believed that Clark was mean because of appellant's complaints, but her own observations were that Clark was considered and even-tempered. A week before the murder, appellant told Judith that she had received information that Clark was moving property into his own name. She told Judith that her divorce from her first husband had left her penniless and that she "would be damned if she would go through another one and end up with nothing." Appellant "didn't want to be stuck with nothing again in the divorce if [Clark] divorced her." During the same conversation, appellant told Judith about a "plumber with Mafia ties from Florida" that she believed was threatening Clark. However, she did not seem very worried about Clark, but was more concerned with him moving property into his own name. Judith also testified that she visited appellant in the hospital the day after the murder and was surprised to find out that appellant had already had Clark's body cremated.

Dr. G. Aubert, a chiropractor and appellant's boss, testified that appellant told him she needed to work because she was a cancer patient and was receiving chemotherapy treatments that precluded her from working full-time. Appellant worked for Aubert for approximately one month before the murder. She told Aubert that appellant was a "tightwad" and would not give her money that she needed for groceries. She "was always complaining about Ed, what a bad guy Ed was, how miserable she was." One day Aubert wrote a note to cheer appellant up that said, "Sorry about Ed." The note was found in appellant's house after the murder. Appellant had also told Aubert about having heard that Clark was transferring assets in anticipating of filing for divorce. She also mentioned that Clark was having an affair.

On the morning of the murder, appellant called Aubert and told him about the murder. He offered to help her financially, and she told him that she had an attorney who had told her that police wanted to check her for gunshot residue. Appellant told Aubert she could not allow such a test because she did have gunshot residue on her hands as she had recently fired a gun at target practice. Aubert found it odd that appellant would be shooting target practice because she had been off work sick. Appellant also asked Aubert whether he could find a doctor to admit her to the hospital. She later told him that her own doctor had had her admitted. It was Aubert's impression that appellant was admitted to the hospital to avoid giving a statement or having gunshot residue tests performed. Five days after the murder, appellant asked to borrow $10,000 from Aubert. She claimed she was broke because she spent $3,000 to have the Ed's body cremated. Aubert declined to loan her the money.

***Forensic testing in 1987***

Reports showed that the long nightgown, a robe, and a short nightgown were submitted to the DPS laboratory in April 1987 for GSR analysis. Back then analysts used the Griess method, which required that the garments be treated with a chemical before the analyst laid a piece of photo paper on it and applied a hot iron to the paper in hopes of transferring the phosphates from the gunpowder primer onto the photographic paper. The Griess method used harsh chemicals likely to be destructive of any blood, and the heat from the iron could also destroy biological material. Analysts applied the chemical in a non-uniform manner so some parts became more saturated than others with the chemicals. The cuffs of the nightgown then went to the Harris County Forensics Center in May 1987 for more GSR testing, but the results were inconclusive. In 1987, the technology did not produce any physical evidence

to establish that appellant committed the murder. The homicide investigator saw some blood spatter on the comforter, but he saw no visible spatter on appellant's clothing. Although never excluded as a suspect, police did not charge her at the time of the murder.

*Forensic testing in 2008*
**\*4** In 2008, the Harris County Sheriff's Office Cold Case Squad renewed the investigation into Clark's murder. Another investigator working with the squad requested appellant's nightgown to search for biological material, and he reviewed the old forensic reports. That investigator had training and experience in blood impact spatter evidence. He first viewed the gown with his naked eye and then with a microscope. A gunshot wound may cause high velocity impact spatter, consisting of fine mist particles that cannot be seen by the naked eye. Those particles usually travel less than four feet before falling onto the surface beneath them. The resulting particles are one millimeter or less. The microscope the analyst used to search for the particles which would not have been available to the Harris County Sheriff's Office employees in 1987. It magnified the nightgown, he photographed it, and he saw what looked like blood on the gown's fibers. The pattern was consistent with high velocity impact spatter (HVIS) which was traveling with enough force to penetrate the fibers. A head wound is likely to produce a HVIS because when the weapon is fired the pressure from the bullet penetrating the skull, along with the gasses from the gun, force blood and biological material out of the wound. Consistent with this explanation, the officer noticed a bone fragment in the bedding crime scene photos. Ultimately, he found roughly 100 or more microscopic stains on the gown that appeared consistent with blood stains. If blood, the HVIS was consistent with appellant's nightgown being within four feet of the shooting. The officer attempted to review the comforter for similar stains, but could not locate it. The officer tested one spot on the gown with a presumptive chemical test for blood and it reacted positively. He then sent the gown to the Harris County Institute for Forensic Science for additional testing.

The State had an additional blood spatter analyst testify to his analysis of the stains. He explained the differences in pattern between an exit wound from a gunshot and back spatter. He also had expertise in forensic photography, and he documented his review of the gown with photographs also identifying a mist spatter on it. Using a particular wavelength, some of the stain fluoresced inconsistent with blood, but possibly explained by chemicals used on the garment. However, others stains absorbed light consistent with a blood stain. He concluded that if one of the stains was confirmed as blood, the consistency of the pattern with the remaining stains was sufficient to call it a bloodstain pattern.

The second analyst saw only 55 stains, but accounted for the difference by assuming dried blood can flake off of fabric as it is moved, packaged, and reviewed. The largest microscopic stain he reviewed later flaked off. He also considered the bone fragment documented in the crime scene photographs as evidence of blow-back from the head wound.

A DNA analyst from the Harris County Institute of Forensic Sciences tested some of the stains on the nightgown and bedding. DNA testing was not available in Harris County in 1987, and earlier testing and environmental conditions may affect her ability to recover DNA. She tested the dark stains that had reacted presumptively positive for blood, but her confirmatory testing using Hematrace confirmed only one spot as blood. Although sensitive, the Hematrace test still requires a sufficient amount of blood or it has a negative result. Hematrace tests for human blood, but also shows positive for upper primate blood and ferret blood. She tested eight spots from different areas, all with negative results. The one positive test came from the front of the nightgown. When the analyst tested a cutting from the large blood-like circle on the sheet after a presumptive positive test, it also tested negative on the confirmatory test. None of the stains on the bed sheet taken from above the back wound tested positive for human blood after 26 years in storage and past testing. Over time, storage conditions can degrade the hemoglobin that the tests identify. Testing on the nightgown found no detectable DNA. The nightgown also underwent additional GSR analysis at the Harris County Institute for Forensic Sciences. The Director of Physical Evidence explained the changes to GSR analysis since 1987. The 1987 test used an atomic absorption analysis, which was a technique for analyzing whether there was barium, lead, and antimony, but the analysis required a bulk recovery. Now they test using S.E.M testing, which seeks only the individual particles. GSR is easily transferable affecting the ability to collect it. The director's testing of the nightgown and packaging in 2011 revealed nine lead particles, but only one characteristic of GSR. He found one particle with lead, barium, and antimony, classifying the result as inconclusive. Standards considered one particle insufficient to establish the garment's presence for a weapon's discharge because

it could result from accidental secondary contact. He retested and found a second particle, but a positive test requires three for reasonable scientific certainty that the garment was present for a firearm's discharge. Studies showed that the statistical probability of having a single GSR particle on a person is 1 in 81 people, but the probability of two is 1 in 10,000 people, and the probability of having three particles is 1 in 1,000,000. The particles are easily dislodged, and the Griess method of testing done on the gown could cause an even greater loss.

**\*5** A firearms examiner tested the Charter Arms revolver, which fired +P rounds holding more gunpowder than average ammunition to push the projectile out of the barrel of the weapon with greater force. Consistent with the 1987 analysis, the Charter Arms revolver fired the two casings recovered from it.

An assistant medical examiner reviewed the autopsy performed on Clark. He had stippling on the head wound, indicating the shot came from fairly close range, usually not more than 18 inches. A .38 caliber bullet was recovered from the front left side of Clark's brain. The discharge came from directly behind his head on the left side. The head wound would have been fatal, but Clark could have had some involuntary body movement afterwards because the bullet did not sever the brainstem. He had a second entrance wound to the left side of his back. The holes in the bedding were consistent with the wound positions on Clark's body. No stippling was visible on the wound inflicted through the comforter, but photographs showed a substance consistent with gunpowder on the comforter, which was also consistent with the weapon firing from 18 inches or less.

### Defensive theory about other threats against Clark's life

The defensive theory at trial was that someone else had been threatening Clark and was the murderer, not appellant. In support of this theory, appellant sought to have admitted an audiotape of a message that a male voice left on her answering machine shortly before Clark's murder on which someone threatened Clark's life. The tape had been recovered by appellant's attorney at the time, Rick Brass, and kept in his office for decades. However, unable to authenticate the tape through Brass's testimony without risking the waiver of the attorney-client privilege, defense counsel chose not to admit it at trial. There was testimony, however, about the tape. Judith Manack testified that appellant asked her to listen to it, which she did. Judith believed that the person on the tape was appellant's son, Mark, who had been kicked out of the house.

There was evidence of two prior threatening incidents involving the Clarks. In 1983, four years before the murder, the Clarks' house was vandalized. While Clark and appellant were out at dinner, someone came in the house, spray-painted everywhere, ripped a picture of Clark, and left a threatening note made of cut out letters.

Then, in 1986, about six months before the murder, Clark was assaulted while he slept on the sofa in his home. According to his friend, John Baff, Clark "woke up and saw some kind of a shadow, or something standing behind him, or at the end of the couch. When he came to he was hit over the head." As a result of the attack by the unknown assailant, Clark had to get stitches. Baff thought appellant might have been the attacker and asked Clark about it, but Clark thought appellant's son, Mark, had done it.

There was also the suggestion that a plumbing contractor from Miami, Billy Salyers, might have had a dispute with Clark. Thus, the State called Salyers, who admitted that, a few days before the murder, he had threatened Clark's life after Clark fired him from a job in Miami. Salyers said that he later apologized, and Clark let Salyers take his tools, which Clark had been holding, and leave. Salyers testified that he talked to police shortly after the murder and told them that he was in Florida at the time. Salyers denied knowing Mike Todaro, the registered owner of the revolver found at the scene of the crime.

### SUFFICIENCY OF THE EVIDENCE

**\*6** In her first issue, appellant argues that the evidence is insufficient to support her conviction because the State's case consists of 1) inconclusive evidence and 2) speculation that Ms. Clark told lies. Essentially, appellant asserts that the State's evidence is speculative and cannot rise to the level of proof beyond a reasonable doubt.

23

*Standard of review and applicable law*

We review a challenge to the legal sufficiency of the evidence under the standard enunciated *in Jackson v. Virginia, 443 U.S. 307, 318-20, 99 S.Ct. 2781, 2788-89 (1979). See Ervin v. State, 331 S.W.3d 49, 52-56 (Tex.App.-Houston [1st Dist.] 2010, pet. ref'd)* (citing *Brooks v. State, 323 S.W.3d 893, 894-913 (Tex.Crim.App.2010)*). Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson, 443 U.S. at 317-19, 99 S.Ct. at 2788-89; Laster v. State, 275 S.W.3d 512, 517 (Tex.Crim.App.2009)*. Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *See Jackson, 443 U.S. at 314, 318 n.11, 320, 99 S.Ct. at 2786, 2789 & n.11; Laster, 275 S.W.3d at 518; Williams v. State, 235 S.W.3d 742, 750 (Tex.Crim.App.2007)*.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson, 443 U.S. at 319, 99 S.Ct. at 2789; Clayton v. State, 235 S.W.3d 772, 778 (Tex.Crim.App.2007); see also Brown v. State, 270 S.W.3d 564, 568 (Tex.Crim.App.2008)* (stating jury is sole judge of credibility of witnesses and weight to give their testimony). An appellate court presumes that the factfinder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson, 443 U.S. at 326, 99 S.Ct. at 2793; see also Clayton, 235 S.W.3d at 778* (reviewing court must "presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination").

In viewing the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton, 235 S.W.3d at 778*. In determining the sufficiency of the evidence, a reviewing court examines "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* (quoting *Hooper v. State, 214 S.W.3d 9, 16-17 (Tex.Crim.App.2007)*). Finally, the "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt, even if every fact does not "point directly and independently to the guilt of the accused." *See Powell v. State, 194 S.W.3d 503, 507 (Tex.Crim.App.2006)*.

**\*7** A person commits murder if she intentionally or knowingly causes the death of another person or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of another. TEX. PENAL CODE § 19.02(b)(1), (2) (Vernon 2011).

*Analysis*

Appellant, pointing to only five pieces of evidence—the spot of blood, the gunshot residue, the run through the woods at night, the shooting of a gun and going to the hospital while sick, and allegations that appellant had cancer—argues that the evidence of her guilt is legally insufficient. However, we must determine whether the necessary inferences are reasonable based on the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State, 343 S.W.3d 152, 155 (Tex.Crim.App.2011)*.

Here, appellant, admittedly, was home when Clark was murdered while sleeping in his own bed. There was no forced entry into the home and no indication of a robbery. The alarm, which Clark routinely set, did not go off. Clark was shot with a gun that witnesses identified as his own. The murderer left the gun at the murder scene.

Appellant claimed to have run through the woods after she heard shots, but when she appeared at the Manacks' house, her gown and feet were both clean. When she fled her house, appellant went through the garage, even though it was not the closest exit to the bedroom in which she had been sleeping.

At the Manacks' house, appellant spent 30 to 45 minutes in the bathroom before sitting down and telling them what had happened and calling her daughter. When police arrived, appellant signed a consent-to-search form, but was otherwise uncooperative. Even though she promised police that she would come by the office later in the day to provide a statement, appellant never showed up. She went home, changed clothes, and tried to get her boss to have one of his doctor friends admit her to the hospital. She then took her nightclothes to the Manacks' home and asked Judith to wash them because her washer was broken. Appellant went to the bank the same day as the murder to withdraw funds. That same day, her own doctor had her admitted to the hospital. When police showed up the question her there, they were unable to do a GSR test because appellant had already showered. Appellant had told both Judith Manack and Dr. Aubert that she could not take a GSR test because she had been firing a gun at home, even though she was supposed to have been home from work because she was sick. When Judith Manack visited appellant in the hospital shortly after the murder, Judith was shocked because appellant had already had Clark's body cremated. Appellant did not attend the memorial service that Clark's boss held, nor did she hold her own service.

There was also evidence that appellant was aware that Clark was having an affair and was preparing to leave her. John Baff testified that on the night of the murder, it was his impression that Clark intended to go home and ask appellant for a divorce. Appellant had told Judith that she was aware that Clark had been moving property into his own name that that she "didn't want to be stuck with nothing again in the divorce if [Ed] divorced her." Although motive and opportunity are not elements of murder and are not sufficient to prove identity, they are circumstances indicative of guilt. *Clayton, 235 S.W.3d at 781* (stating that motive "may be a circumstance that is indicative of guilt."); *Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)*.

**\*8** The forensic evidence also provided evidentiary support for appellant's conviction. Even though nothing was seen on appellant's gown in 1987, when it was re-examined years later, a forensic examiner, using a microscope that was not available in 1987, saw what he felt was high velocity impact spatter. While only one spot of the high velocity impact spatter tested conclusively positive for blood, the jury could have reasonably concluded that, in the years between the murder and the reopening of the case, the hemoglobin in the other spots had degraded. There was expert testimony that hemoglobin would degrade over time and under certain conditions, and the jury was aware that the bed sheet that was covering Clark's body at the time he was shot also tested negative for blood even though photographs showed Clark's body lying on the undisputedly blood-soaked sheet at the time of the murder. And, even though no GSR was found on appellant's gown in 1987, when new, more sensitive tests were performed on the gown when the case was reopened, examiners found two particles of gunshot residue on the front of the gown. The examiner described this as an inconclusive result because 1 in 10,000 people would have gunshot residue on them if they had not fired a weapon rather than the 1 in 1 million required for a conclusive result.

Having viewed the evidence in the light most favorable to the verdict, we hold that the evidence is sufficient to support appellant's conviction. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial. *See Jackson, 443 U.S. at 319, 99 S.Ct. 2781*; *Hooper, 214 S.W.3d at 16-17*. The jury also decides what weight to give expert opinions. *See Bearnth v. State, 361 S.W.3d 135, 140 (Tex. App. - Houston [1st Dist.] 2011, pet. ref'd)*. The jury inferred from the circumstantial evidence, coupled with the forensic evidence, that appellant was guilty of the murder of her husband. "This was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012)*.

We overrule appellant's first issue on appeal.


**INEFFECTIVE ASSISTANCE OF COUNSEL**

In her second issue, appellant argues that the trial counsel was ineffective because he failed to introduce (1) a

recording of a voice-mail death threat against Clark and (2) a video of the woods between the Clark and Manack residences taken right after the murder. Appellant asserts that "there is a reasonable probability that the evidence that defense counsel failed to offer would have affected the outcome of the trial."

### Standard of review and applicable law

To show ineffective assistance of counsel, a defendant must demonstrate both (1) that her counsel's performance fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687-88, 694, 104 S.Ct. 2052, 2064, 2068, (1984); *Andrews v. State,* 159 S.W.3d 98, 101-02 (Tex. Crim. App. 2005). A defendant has the burden to establish both of these prongs by a preponderance of the evidence, and a failure to make either showing defeats an ineffectiveness claim. *Mitchell v. State,* 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). We presume that counsel's conduct falls within the wide range of reasonable professional assistance, and we will find counsel's performance deficient only if the conduct is so outrageous that no competent attorney would have engaged in it. *Andrews,* 159 S.W.3d at 101.

We cannot speculate beyond the record provided, so any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *see Anderson v. State,* 193 S.W.3d 34, 39 (Tex. App. -Houston [1st Dist.] 2006, pet. ref'd). Because the record is usually underdeveloped, direct appeal is often an inappropriate forum in which to bring this type of claim. *Rylander v. State,* 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003). The necessary record is best developed in a hearing on a motion for new trial or by application for a writ of habeas corpus. *See Jackson v. State,* 973 S.W.2d 954, 957 (Tex. Crim. App. 1998).

**\*9** "An attorney's failure to investigate or present witnesses will be a basis for establishing ineffective assistance of counsel only where it is shown that the witnesses would have been available and that the presentation of the evidence would have benefitted appellant." *Pinkston v. State,* 744 S.W.2d 329, 332 (Tex. App. -Houston [1st Dist.] 1988, no pet.) (citing *Coble v. State,* 501 S.W.2d 344 (Tex. Crim. App. 1973)). "Failure to object to admissible evidence does not constitute ineffective assistance of counsel." *Lee v. State,* 29 S.W.3d 570, 579-80 (Tex. App. -Dallas 2000, no pet.); *see also Ex parte Jimenez,* 364 S.W.3d 866, 887 (Tex. Crim. App. 2012) ("The failure to object to proper questions and admissible testimony ... is not ineffective assistance.").

### Background

At trial, appellant sought to introduce a tape of a threat made against Clark made by a male, which was left on appellant's answering machine near the time of the murder. Appellant planned to call her attorney at the time of Clark's death, Rick Brass, to testify that he recovered the tape from the answering machine and kept it in his possession until the case was reopened, at which time he gave it to defense counsel. It is undisputed that the existence of the audiotaped threat was known to the jury through the testimony of other witnesses, but the jury never actually heard the tape because defense counsel decided not to introduce it. Defense counsel was concerned that calling Brass to authenticate the tape might waive attorney-client privilege and open him up to cross-examination on other privileged matters. When the issue was discussed at trial, the following exchange took place:

[Defense Counsel]: Judge, we have been talking about the audio cassette tape threatening message, the threatening message—

[Trial Court]: Yes.

[Defense Counsel]: —that Judy Manack testified about hearing it.

[Trial Court]: Okay.

[Defense Counsel]: We haven't introduced that through anybody yet. The reason for that is chain of custody and all of that. What we would like to do is put Rick Brass on to introduce it, to lay the predicate to introduce it. Rick was hired. He was the lawyer. He went to the Clarks' house. He retrieved—back then, he took that tape out of the answering machine, and he kept it—

[Trial Court]: Okay. So, he's had custody of it?

[Defense Counsel]: —all these years. And he gave it to us. And that's the purpose for which I was trying to call him.

[Trial Court]: Right.

[Defense Counsel]: [The Prosecutor] is of the opinion that that would breach the attorney/client privilege. If that's the case—if the Court would rule that, I would not call Rick Brass.

[Trial Court]: No, it's for chain of custody.

[Defense Counsel]: That's my opinion, and that is—

[The Prosecutor]: You don't want to hear my response?

[Trial Court]: Well, I will.

[The Prosecutor]: Okay. Well, my position is, Judge, that the way that Rick Brass knew where the tape was, the way that he obtained access into the house to retrieve the tape is based on communications with his client. And, so, the questions necessarily call into—call into question communications that were the product of attorney/client communications, or attorney/client privilege.

[Trial Court]: Okay. Yeah, that's different, I think.

[Defense Counsel]: It has to be privileged communication, and those were not privileged communications.

[Trial Court]: Wait a minute. I think that's different. I think that's different. Because what you're—you're not trying to get into any kind of privileged information. What you want to know is how did he know about the tape, and how did he come into custody of the tape. And I think that goes along with chain of custody. But if you're—if you're going to go into anything like, you know, any private discussions that she may have had, as long as they go to the chain of custody with the tape—you see what I'm saying?

**\*10** [The Prosecutor]: I do understand. There's also communications that she disclosed to other individuals, that we've heard testimony in this case that pertain to communications between her and her lawyer. So, it would be my position that she's waived the attorney/client privilege with respect to those communications because she has shared those communications with other individuals that are not her attorney. And, so, it would be my position that I can then ask her attorney about the comments that she—

[Trial Court]: Okay. I understand. What say the defense?

[Defense Counsel]: Judge, my response to that is, I know that the State has had people testify that they heard it. We dispute that completely.

[Trial Court]: That they heard what?

[Defense Counsel]: That they heard any conversation between Norma and Rick Brass. I don't know that—

[Defense Counsel]: I think the only information—let me stop. The only information that I know of, that I've heard—I don't think I've heard anything about any communications that she had with Rick Brass, other than have him—if there were recommendations, or whatever, to get an attorney, or that she had an attorney previously, an attorney regarding divorce, an attorney regarding the criminal case. And all of that is in front of the jury. Okay? And there was audio—or the tape that was introduced that says that she had an attorney, and that she was advised

by her attorney not to testify. If that's what you believe is a breach of attorney/client privilege—

[The Prosecutor]: I'm not necessarily saying the entire privilege. I'm asking that I be allowed to cross-examine this witness concerning the statements that the defendant made to other individuals concerning his advice, his instructions, his—the things that he was telling her to do or not to do.

[Trial Court]: What individual statements? What statements?

[The Prosecutor]: Well, we've got the statement where he told her not to give a statement to the police. He told her not to go downtown because they would test her hands for gunshot residue, that he told her not to testify in front of the grand jury. Let me make sure I remember all of them. That he was—it was—he was attempting to get her admitted to a hospital, or that it was—

[Trial Court]: Who—she made those statements to other people?

[The Prosecutor]: Dr. Aubert testified that she told him that her lawyer was trying to get her admitted to a hospital.

[Trial Court]: Okay. Yeah, but who called Dr. Aubert as a witness?

[The Prosecutor]: Well, I did.

[Trial Court]: Okay. That's the problem.

[The Prosecutor]: But the waiver is the fact that she made those statements to him. That's what waives the privilege as to that communication. It's not whether or not I called the witness that spoke about them, I don't think.

[Defense Counsel]: Well, I disagree because if I tell somebody that I've been advised by a lawyer to take the Fifth Amendment, that doesn't mean that my conversations with my lawyer are now—

[The Prosecutor]: And I don't want to get into all of the conversations with the lawyer. I want—

[Defense Counsel]: Judge, I will short-circuit it. I'm not going to call Rick Brass. It's too touchy of a question.

[Trial Court]: Well—

[Defense Counsel]: It's okay, Judge.

[Trial Court]: That's the only chain of custody.

[Defense Counsel]: I've been instructed not to waive attorney/client by my client, and I don't want to—I don't want to do something that's going to run the risk of that possibly coming in. I will not call Rick Brass.

**\*11** [Trial Court]: Well, then, that resolves it. Okay.


*Analysis*
Appellant contends that defense counsel was ineffective for deciding not to call Rick Brass to establish a chain of custody for admission of the audiotape because "[i]t is clear from this exchange that the trial court was inclined to allow Rick Brass's testimony for chain of custody on the tape only, without considering it a blanket waiver of privilege."

Appellant also contends trial counsel was ineffective for failing to introduce a video, in which appellant conducted a "walk-through of what happened" with Brass near the time of the shooting. The video showed the path appellant claimed to have taken through the woods to the Manacks' house. This video, like the audiotape from the answering machine, was kept by Brass for over two decades.

28

Appellant relies on *Cameron v. State,* 241 S.W.3d 15, 17 (Tex.Crim.App.2007), in which the defendant wished to call his former attorney to testify that he had seen two different police reports in the State's file. The trial court would not allow the attorney to testify without a blanker waiver of the attorney client privilege. *Id.* On appeal, the court held that the defendant's privilege was waived only "to the extent that it dealt with the notes relating to the State's file." *Id.* at 21.

"[I]f the client uses the lawyer to prove [a] matter that [the lawyer] would only have learned in the course of his employment[,] this again should be considered a waiver as to related privileged communications." 1 MCCORMICK ON EVID., § 93 (7th ed.) (citing 8 WIGMORE, EVIDENCE § 2327 (McNaughton rev.1961)). Even though we agree that Brass's testimony as to chain of custody would not be a blanket waiver of attorney-client privilege, and would only be a waiver as to communications related to the recovery of the audiotape or the creation of the videotape, we do not know what those related communications might have included had Brass been subject to cross-examination. As such, trial counsel had a strategic purpose in not calling Brass, as he testified in the motion for new trial hearing. Trial counsel's decision not to call Brass and risk opening up testimony to those related communications was a question of strategy, and his decision not to call appellant's former attorney in these circumstances does not fall below reasonably effective assistance.

Appellant also contends that the audiotape and videotape could have been introduced without Brass's testimony through the ancient documents exception to the hearsay rule, which provides that "[s]tatements in a document in existence twenty years or more *the authenticity of which is established*," "are not excluded by the hearsay rule, even though the declarant is available as a witness[.]" TEX.R. EVID. 803(16) (emphasis added). The obvious problem with this assertion is that Brass's testimony was necessary to establish the authenticity of the tapes. Nevertheless, appellant argues that, despite the language of Rule 803(16) requiring authentication for an exception to the hearsay rule, no authentication was required because of Rule 901(b)(8), which provides that the authentication requirement is satisfied if there is "[e]vidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence twenty years or more at the time it is offered." TEX.R. EVID. 901(b)(8). Again, however, Brass's testimony would have been necessary at trial to show that the requirements of 901(b)(8) had been met before the tapes could have been admitted. As we stated earlier, not calling Brass to testify about the collection of the audiotape or the making of the videotape could have been sound trial strategy because doing so would have subjected him to cross-examination on any related communications relayed to him by appellant.

**\*12** For these reasons, we overrule appellant's second issue on appeal.

## ADMITTING SCIENTIFIC TESTIMONY

In her third and fourth issues on appeal, appellant contends the trial court erred in admitting scientific evidence regarding (1) inconclusive GSR tests and (2) negative findings for blood. Appellant argues that the evidence was "speculative," which we construe as a challenge to the relevancy of the challenged evidence.

### *Standard of review and applicable law*

A trial court's determination of a witness's qualification as an expert and its decision to exclude expert testimony are reviewed for an abuse of discretion. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex.Crim.App.2000). If the trial court's ruling lies within the zone of reasonable disagreement, the trial court's ruling will be upheld. *Id.*

Rule 702 of the Texas Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702. The proponent of expert testimony must show by clear and convincing proof that the evidence he seeks to introduce is sufficiently (1) relevant and (2) reliable to assist the trier of fact in accurately understanding

otherwise pertinent facts of the case. *See Weatherred, 15 S.W.3d at 542*.

The standard for relevance is whether the scientific principles "will assist the trier of fact" and are "sufficiently tied" to the pertinent facts of the case. *Jordan v. State, 928 S.W.2d 550, 555 (Tex.Crim.App. 1996)*. The expert must make an effort to tie pertinent facts of the case to the scientific principles that are the subject of his testimony. *Id.* "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." TEX. R. EVID. 403.

### *Evidence of probabilities relating to inconclusive GSR results*

In her third issue, appellant asserts that the trial court erred in admitting scientific testimony regarding probabilities in inconclusive GSR results. At trial, Dr. William Davis, an expert on GSR, testified that he tested appellant's blue nightgown, which she had worn on the morning of the murder for the presence of GSR. The first time he tested it, he found one particle of GSR. He then retested a broader area and found a second particle of GSR. Davis testified that his laboratory required three particles of GSR before he could conclusively testify that the GSR was a primary deposit rather than a secondary deposit. When Davis attempted to testify about the statistical probabilities of two particles, appellant objected, at which time the trial court conducted a voir dire outside the presence of the jury. Davis explained that three particles were considered conclusive for GSR because the likelihood of three particles of GSR on a person who had not fired a gun was 1 in 1 million. For two particles of GSR, the statistical probability was 1 in 10,000; for one particle of GSR; the statistical probability was 1 in 81. When asked about the basis of this conclusion, Davis explained that he relied on a published study in which police officers on desk duty, who had not fired their weapons in 30 days, were sampled. Davis pointed out that the officers in the study were in a GSR environment, so the application of its statistics to people that were not in a GSR environment was very favorable. Defense counsel asked Davis to look at the photos of appellant's home, which contained three guns and ammunitions, and determine whether that would be a GSR environment, to which appellant replied that it likely would be so. Davis testified that he could not establish a baseline for GSR in GSR environments because he would "have to consider every possible environment." Instead, he relied on the study, which was conducted in a GSR environment [police officers at work who had not filed their weapons in 30 days] and applied it to people who had not fired a gun in non-GSR environments, "which is very favorable to the person that has never fired a gun." Defense counsel then argued at trial, as does counsel on appeal, that it was error to allow Davis's testimony because Davis was not able to testify about the likelihood of GSR particles in appellant's home. The trial court then permitted the testimony. During cross-examination, defense counsel questioned Davis extensively about how the probabilities of an accidental transfer of GSR could be different from the statistics quoted if the samples were taken from a GSR environment like appellant's home.

### *Analysis*

**\*13** Appellant argues that, because Davis "testified that he could not apply the statistics to people in GSR environments and he also testified that the Clark home was a GSR environment, it was error to allow his testimony over objection."

We first consider whether the scientific testimony regarding the statistical probabilities would "assist the trier of fact" in this case. *See Jordan, 928 S.W.2d at 555*. Here, Davis testified that his GSR tests were "inconclusive." The statistical analysis was relevant to help the jury understand what a "conclusive" test was and the meaning of an "inconclusive" test. As Davis explained, a conclusive test required three particles of GSR from the item sampled. Only 1 in 1 million people would have three particles of GSR on their clothes if they had not fired a gun. The 1 in 1 million statistic was the point at which Davis's laboratory felt comfortable describing a GSR test as conclusive. However, Davis's testimony also explained that a GSR test that was not conclusive did not mean that no GSR residue was present; to the contrary, an inconclusive result could still be a positive detection of GSR, just at levels beneath the 1 in 1 million described as "conclusive." As the number of GSR particles recovered dropped, the likelihood that they were deposited as the result of a primary transfer also dropped. At two particles of GSR—the amount recovered from appellant's nightgown—the statistical probability of an accidental or secondary transfer was 1 in 10,000, an amount Davis and his laboratory were unwilling to describe as conclusive. However, the statistical information was helpful to assist the trier of fact in determining what was meant by an "inconclusive" GSR test.

We next consider whether the evidence was "sufficiently tied" to the pertinent facts of the case. *Jordan, 928 S.W.2d at 555*. Appellant argues that the statistical evidence was not tied to the facts of the present case because Davis could not testify about the amount of GSR that might have been present in appellant's home due to the presence of three guns and some ammunition. Thus, appellant argues, the statistical evidence could not be applied to appellant because it assumed a person that had not fired a gun in a non-GSR environment.

The Court of Criminal Appeals has elaborated on what is required in such a review.

> In *Jordan v. State,* [928 S.W.2d 550 (Tex. Crim. App. 1996) ] we specifically addressed the "fit" aspect of the relevance inquiry. There, the proffered expert "answered questions about the specific facts of the case and how they might be affected by the factors he testified to," "stated his opinion about the reliability of the eyewitness identifications," and "identified facts in the case that he believed impacted those identifications." *Id. at 556*. However, the expert "did not testify about several factors that might have affected the reliability of the eyewitness identifications"; nor did he "interview the witnesses or examine certain pieces of evidence." *Id. at 555-56*. We held that, although the expert "did not testify as to every conceivable factor that might affect the reliability of eyewitness identification present," his testimony "was sufficiently tied to the facts to meet the simple requirement that it be 'helpful' to the jury on the issue of eye witness reliability." *Id. at 556*. We explained that the question under Rule 702 is "not whether there are some facts in the case that the expert failed to take into account, but whether the expert's testimony took into account enough of the pertinent facts to be of assistance to the trier of fact on a fact in issue." *Id.* Further, we noted that the expert's failure to account for some facts "is a matter of weight and credibility, not admissibility." *Id.*

**\*14** *Tillman v. State,* 354 S.W.3d 425, 438 (Tex. Crim. App. 2011) (footnote omitted).

Davis's testimony makes clear that it was based on a sampling of police officers at work, albeit officers who had not fired their weapons within 30 days. Such a sampling, Davis explained, was actually taken from a GSR environment [officers on duty who had not fired weapons], and applied to people in non-GSR environments who had not fired weapons. Such a sampling would be "very favorable to the person who has never fired a gun." In other words, if 1 in 10,000 officers on duty in a GSR environment had two particles though not having fired a gun, people in no-GSR environments who had not fired a gun should also have 2 particles or less of GSR. The trial court could have reasonably decided that appellant's home with three guns and some ammunition, though not a no-GSR environment, was sufficiently similar to the workplace of the police officers sampled to "sufficiently tie" the study Davis relied on to the facts of appellant's case and be helpful to the jury. That Davis did not, or could not, take into account the specific amount of GSR in appellant's home goes to the weight of his testimony, not its admissibility.

Accordingly, we overrule appellant's third issue on appeal.

### Evidence regarding negative blood tests on the deceased's sheets

In her fourth issue, appellant argues that the trial court erred in admitting speculative testimony regarding the comparison of negative blood tests on the sheet with results on the nightgown. At trial, Katie Welch, assistant director of the Harris County Institute of Forensic Sciences–Forensic Genetics Laboratory, testified about blood tests that she performed on appellant's nightgown and the deceased's bed sheets. On appellant's nightgown, Welch initially tested some visible orange stains, which were negative for blood. She then tested eight microscopic stains that Detective Rossi had identified as possible high velocity blood spatter. Using a Hematrace test, Welch found that one of the microscopic stains was identifiable as blood. She was not, however, to obtain any DNA from any of the stains.

During Welch's testimony, but before she testified about her testing of the decedent's bed sheet, defense counsel objected, stating, "I would ask ... that the Court grant a motion in limine that the State and the witness not be allowed to enter into any discussion of false negatives, or anything that relates to that, or make any—or any statements that a negative result is anything other than a negative result[.]" After noting that there were some circumstances "where it's legitimate to explain a negative result[,]" the trial court declined to grant defense

31

counsel's motion in limine requiring that defense counsel object when objectionable testimony was offered. At which point, defense counsel stated, "My objection would be any discussion of the false negatives, any explanation for a false negative at all from this witness I think is irrelevant, and if it's not irrelevant, then it's 403, and it's improper expert witness testimony."

**\*15** Welch then testified that she tested five areas from the large stain on the sheet taken from the bed where Clark was shot. One area was both presumptively negative[1] for blood, and the Hematrace test used to confirm the presence of blood was also negative. The other four areas on the sheet tested presumptively positive for blood, but the Hematrace tests could not confirm the presence of blood.

Welch later explained that the Hematrace test detects the presence of the hemoglobin protein in blood, and that "hemoglobin can degrade over time."

*Analysis*

Appellant contends that Welch's testimony was speculative because "[t]he analyst in this case testified over objection that apparent blood stains on a sheet tested negative for blood when they appeared to be blood and so a falsely negative result is to be inferred both on the sheet and the nightgown." However, we disagree with appellant's assessment of Welch's testimony.

Welch never testified that the negative results on the nightgown were false negative results. In fact, when invited to do so by defense counsel, Welch actually refused to speculate.

> [Defense Counsel]: Do you intend for the jury to understand your testimony to be that the seven negative tests that you got on Hematrace [on the nightgown] really might have been blood anyway? Is that what you intend for them to understand from your testimony?
>
> [Welch]: That is possible, yes.
>
> [Defense Counsel]: That's what you want them to understand?
>
> [Welch]: I would like them to understand that the result that I got for those Hematrace tests were negative. But I'd like for them to understand what the meaning of a negative result is.
>
> [Defense Counsel]: Let's talk about that from your point as—from your perspective as a scientist. You wouldn't tell the DA's office that you got a positive result, would you?
>
> [Welch]: I'm sorry, I don't quite understand.
>
> [Defense Counsel]: Let me ask it this way. Can you say within a reasonable degree of medical or scientific certainty that those are false negative, that those were really blood?
>
> [Welch]: I don't—I got a negative result. I don't know whether they were a false negative.
>
> [Defense Counsel]: I object that's nonresponsive.
>
> [Trial Court]: It's overruled.
>
> [Defense Counsel]: I want you to answer my question within—you're an expert witness in this area, correct?
>
> [Welch]: I am.
>
> [Defense Counsel]: Within a reasonable degree of scientific certainty, are you telling this jury that those were false negatives when they came up negative for blood?
>
> [Welch]: I'm not telling the jury that they were false negatives. The results were negative. I don't know why the results—I don't know the reason for the negative results.

[Defense Counsel]: Is it possible that the reason for the negative results is because they aren't blood?

[Welch]: It's absolutely possible.

\* \* \* \*

[Defense Counsel]: Can you tell the jury that there's no blood on that [nightgown]?

[Welch]: I can tell the jury that that one spot was Hematrace positive, and the Hematrace test is positive for blood. We do not say human blood for the reasons of the possibility of upper primates and ferrets.

[Defense Counsel]: So, there is one microscopic spot of some kind of blood. You don't know if it's transfer, you don't know if it's—versus high velocity?

**\*16** [Welch]: That's correct.

Despite appellant's assertions to the contrary, Welch did not speculate that the negative results for blood on appellant's nightgown were false negatives. She clearly confined her testimony to (1) the results of the tests on the nightgown, (2) the results of the tests on the stained sheet, and (3) an explanation that hemoglobin can degrade over times. The trial court could have reasonably concluded that all three items of testimony "w[ould] assist the trier of fact" and were "sufficiently tied" to the pertinent facts of the case. *Jordan,* 928 S.W.2d at 555. If indeed the jury reached the conclusion that the negative tests on the nightgown were false negatives due to degradation of hemoglobin, such an inference was reasonably supported by the evidence presented.

We overrule issue four.

## CLOSING ARGUMENT

In her fifth issue, appellant argues that the trial court erred in overruling defense counsel's objections to improper argument at closing. Appellant asserts that the State injected harmful, prejudicial facts into the record that appellant had lied about having cancer.

### Standard of review and applicable law

We review claims of improper jury argument for an abuse of disctetion. *Powell v. State,* 63 S.W.3d 435, 438 (Tex.Crim.App. 2001). Permissible jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Davis v. State,* 329 S.W.3d 798, 821 (Tex.Crim.App.2010); *Cannady v. State,* 11 S.W.3d 205, 213 (Tex.Crim.App.2000). Remarks of counsel during closing argument must be considered in the context in which they appear. *Gaddis v. State,* 753 S.W.2d 396, 398 (Tex.Crim.App. 1988). Counsel is allowed wide latitude without limitation in drawing inferences from the evidence, so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Id.*

### Background regarding jury argument

During argument, the State argued as follows:

[Prosecutor]: Don't convict her because she's a liar. Convict her because she's a killer, but the lies tell you that she did it. Why lie about something like cancer? I don't know. But how horrible, how horrible—

[Defense Counsel]: Judge, I'm going to object. That's arguing outside the record.

[Trial Court]: It's overruled.

33

[Prosecutor]: How horrible to lie about something like a disease like that. How horrible to use that to manipulate Dr. Aubert into giving her a job.

[Defense Counsel]: Judge, I'm objecting to that being outside the record. No witness ever testified to that at all.

[Trial Court]: Overruled. I let you argue your case. I will let the State argue their case. You may proceed.

Appellant also complains that the prosecutor injected facts outside the record when she told the jury, "Ed was the love of [appellant's] life, yet she cremated him before his son could say goodbye. What sense does that make?" Appellant argues that "the only purpose [these] argument[s] serve[d] is to inflame the jury and goad them into a conviction based on something beside the evidence."


*Analysis*
**\*17** The State responds that both arguments were reasonable summations of the evidence and reasonable inferences drawn from it. We agree with the State.

During the re-cross examination of the State's witness, Dr. Aubert, appellant's boss, the following exchange took place:

[Prosecutor]: All right. Did she also tell you something about her medical condition that made you feel sympathy for her?

[Dr. Aubert]: She told me that she had—when she came to work, one of the interviews—I don't know whether it was the February lunch, or I interviewed her briefly the day she came to work. One of those times, she told me that she was a cancer patient and she was not able to work, although she had a master's degree in a medical-related field. And I don't remember what it was. She could not hold a job, regular full-time job because it interfered with her therapy for her cancer at M.D. Anderson Hospital.

[Prosecutor]: Can you recall what kind of cancer it was that she told you that she had?

[Dr. Albert]: She said she had bone cancer and it had metastasized to the lumbar region, is what she told me.

Further, appellant's medical records, which were admitted at trial, showed no history of cancer. Thus, the prosecutor had an evidentiary basis upon which to ask the jury to infer that appellant had lied about having cancer.

Regarding the argument about cremating Clark before his children could say goodbye—that too was supported by the evidence admitted at trial. The record shows that appellant was cremated within three days of the murder. When appellant's neighbor, Mrs. Manack, was questioned about Clark's cremation, the following exchange took place:

[Defense Counsel]: Okay. And in regards to the testimony that you gave about—and you seemed to be a little upset about this—that Ed had been cremated by the time you'd gone to the hospital to visit Norma. And you don't know what day that was, right?

[Judith Manack]: No, I don't remember what day it was.

[Defense Counsel]: Okay. Do you have any—

[Judith Manack]: But it only had been a few days, two or three days.

[Defense Counsel]: Okay. Do you have any knowledge about what Ed's wishes were if he were to die?

[Judith Manack]: A. No, I don't.

[Defense Counsel]: So, you don't know that he may have wanted to be cremated if he died?

[Prosecutor]: Calls for speculation.

34

[Trial Court]: It's overruled.

[Judith Manack]: I don't know.

[Defense Counsel]: Is that possible?

[Judith Manack]: I guess, yes.

[Defense Counsel]: And if that were possible, it wouldn't be unusual?

[Judith Manack]: I guess what bothered me is he was a murder victim, and I didn't think that they did that that quickly until they made all their investigation.

[Defense Counsel]: Okay. And certainly—

[Judith Manack]: And I thought his children would be upset.

[Defense Counsel]: I'm sorry?

[Judith Manack]: I thought his children would be upset. I didn't know if they didn't get to see him in a casket, I just thought his children would be upset.

There was also evidence that Clark was cremated, and that appellant did not have a service for him. There was also evidence that Clark's boss, Neil Block, did have a service, but appellant did not attend. And, Neil Block, not appellant, was the person who had informed appellant's ex-wife and children that their father had been murdered.

**\*18** From the evidence about how quickly Clark's body was cremated, and that appellant did not have a service for him or contact his ex-wife and children about his death, a reasonable deduction from the evidence would be that the body was cremated before Clark's son could say goodbye.

Because both arguments complained of on appeal were summations of and reasonable deductions from the evidence, the trial court did not err in overruling appellant's objections to the State's closing arguments.

We overrule appellant's fifth issue on appeal.

## CONCLUSION

We affirm the trial court's judgment.

Footnotes

[1]     Welch testified that the Phenophthalein test is a preliminary test, which can determine whether the sample is presumptive for blood. That test is followed by the Hematrace test, which can confirm the presence of human or higher primate blood.

     © 2015 Thomson Reuters. No claim to original U.S. Government Works.